UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SHAMEKA LYNN O'NEIL                                                    PLAINTIFF

v.                                                        No. 3:25-cv-419-BJB

EQUIFAX INFO. SERVS., LLC, ET AL.                                   DEFENDANTS

* * * * *

## MEMORANDUM OPINION & ORDER

Shameka Lynn O'Neil sued five defendants, all loan servicers or consumer-reporting agencies, because they allegedly caused inaccurate student-loan balances to appear on her credit reports.  According to her allegations, which the Court accepts as true at this stage, the U.S. Department of Education deemed her federal student-loan debt eligible for discharge in January 2025 and discharged the debt in June 2025.  O'Neil's core concern is that, during the intervening five months, the defendants falsely and unlawfully reported that she still owed a loan balance despite the discharge.

This order addresses the two "furnisher" Defendants: Aidvantage and Nelnet.  Their incorrect and misleading student-loan balance statements to consumer reporting agencies, O'Neil maintains, violated the Fair Credit Reporting Act.  *See* 15 U.S.C. § 1681 *et seq.*

O'Neil's allegations, however, fail to suggest any inaccuracy giving rise to liability.  Even on her own telling, the Department hadn't eliminated her debts before June 2025, so a statement that she still owed a balance was not wrong.  And even for the handful of statements reflecting a debt *after* discharge, O'Neil hasn't alleged that she followed the process for correcting an erroneous report before the statute allows a consumer to sue.  Regardless of whether O'Neil could prove her allegations, therefore, they would not establish liability on the part of these two Defendants.  So the Court grants their motions to dismiss. [1]

---

[1] Aidvantage's filing is titled as a "brief in support of motion to dismiss of Defendant Maximus Education, LLC, d/b/a Aidvantage."  *See* DN 38.  It doesn't accompany its own separate motion to dismiss, *see* Local Rule 7.1, and is labeled in the docket as filed in support of *Nelnet's* motion to dismiss (DN 30).  But the Aidvantage brief plainly requested dismissal of O'Neil's claims, so the Court construed the filing as a freestanding motion to dismiss and ordered a response from O'Neil, who complied.  *See* Order (DN 49); Response (DN 50).

## A. The Allegations

O'Neil took out federal student loans to attend Northern Kentucky University starting in 2004. *See* Attached Exhibits (DN 1-2). Later, she filed a "borrower-defense application" (mentioned but not cited in or attached to the pleadings) asking the U.S. Department of Education to discharge her outstanding student-loan debt. *See id.* at 5. The Department apparently didn't act on this request until approximately 2022, when it entered into a settlement agreement with a class of borrowers whose pending relief applications were growing dusty. *See Sweet v. Cardona*, 641 F. Supp. 3d 814 (N.D. Cal. 2022).[2] This classwide settlement provided relief to eligible federal student-loan borrowers who had asserted defenses to repayment based on allegations of fraud (and various other state-law violations) by their higher-education institutions. *See id.* at 819–22.

Consistent with this settlement, the Department notified O'Neil of her eligibility for discharge on January 28, 2025. *See id.* at 2, 4; Attached Exhibits (DN 1-2) at 5.[3] The Department's letter informed O'Neil that it "ha[d] approved your claim for settlement relief," that her loans would "remain in forbearance … until you receive relief," and that her credit report would "reflect this discharge *when it is complete*." *Id.* at 6 (emphasis added). This letter also clarified that relief hadn't yet taken effect: "Pursuant to the *Sweet* settlement, the Department *will* do the following … discharge your Relevant Federal Student loans" and "[y]our servicer *will* send you more details about the discharge, including which loans have been forgiven." *Id.* at 5–6 (emphasis added).

Relying on the Department's letter of approval, O'Neil alleges that her student-loan servicers and consumer-reporting agencies failed to adjust her student-loan balance: "Despite this discharge, Defendants Equifax, Experian, and TransUnion continued to report on Plaintiff's credit reports that she had outstanding student loan balances in excess of $219,000, and at one point reported balances exceeding $400,000." Complaint (DN 1) at 3. In her view, "[t]hese reported balances were

---

[2] O'Neil has attached 188 pages of exhibits to her 8-page complaint. Most are irrelevant, though some contradict her allegations. Those "referred to in the complaint and … central to the claims therein," may be considered in assessing Nelnet's and Aidvantage's motions to dismiss. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011). To the extent "an exhibit contradicts the complaint, 'the exhibit trumps the allegations.'" *Kaplan v. University of Louisville*, 10 F.4th 569, 576 (6th Cir. 2021) (citing *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017)). Though these errors, sometimes mentioned in footnotes below, matter little to the analysis.

[3] For reasons that aren't entirely clear, O'Neil seemingly refers to this January 28 letter in support of her allegation that "[o]n or about March 15, 2025, Plaintiff's loans were approved for discharge under the Borrower Defense to Repayment program." Complaint (DN 1) at 2, 4; Attached Exhibit at 5.

patently incorrect, as Plaintiff's student loans had been discharged in full." *Id.* So she disputed what she considered the "patently incorrect" information: on May 14, 2025, she sent a dispute to Equifax, Experian, and TransUnion;[4] on May 24, 2025, she "submitted a direct dispute to Defendant Aidvantage"; and on June 11, 2025, she sent "written disputes to all Defendants." *Id.*

A week later, around June 15, 2025, O'Neil received confirmation from Aidvantage that her federal student-loan debt had been discharged. *Id.* at 4.[5] Three weeks later, she sued Aidvantage, Nelnet, and the remaining Defendants under the FCRA. *See* Complaint (DN 1).[6]

### B. FCRA claims

Congress enacted the Fair Credit Reporting Act "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 52 (2007). The Act imposes duties on consumer-reporting agencies, such as TransUnion, Experian, and Equifax, as well as "furnishers" of credit information, such as Nelnet and Aidvantage.[7] After notification of a credit dispute from a consumer-reporting agency, furnishers must (among other things) investigate, correct, and report any incorrect or misleading information. *See* 15 U.S.C. § 1681s-2(b). "[T]his framework provides consumers with a private remedy against negligent or willful misconduct by a furnisher, while it simultaneously protects furnishers from answering frivolous consumer disputes." *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 616 (6th Cir. 2012).

O'Neil alleges that she followed FCRA's requirements to dispute inaccurate and misleading student-loan balances. Despite her efforts to dispute this information, she says, Nelnet and Aidvantage failed to comply with their duties to

---

[4] Two of the three consumer-reporting Defendants, Equifax (DN 29) and Experian (DN 55), reached settlement agreements with O'Neil and have been dismissed from this case.

[5] O'Neil alleges that the discharge occurred on June 30, 2025, *see* Complaint at 2, though her exhibits (nos. 1, 4, and 5) indicate it happened two weeks earlier.

[6] O'Neil is a licensed attorney who is representing herself in this litigation. *See* Complaint at 7 (providing bar-license number). Courts generally do not apply the liberal pleading standard afforded to *pro se* litigants to licensed lawyers. *See, e.g., Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618 (6th Cir. 2008) ("It was … not an abuse of discretion to deny [licensed attorneys] special consideration on the basis of their *pro se* status."); *Spence v. United States Dep't of Veterans Affs.*, 109 F.4th 531 (D.C. Cir. 2024) ( "[T]he liberal pleading standard for *pro se* litigants does not invariably apply when the litigant is a licensed attorney.").

[7] A "furnisher" is "an entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report." 12 C.F.R. § 1022.41(c).

investigate and correct her student-loan balance.  But as Nelnet and Aidvantage correctly argue in their motions to dismiss, their duty to update her student-loan balances only kicked in *after* her discharge took effect.

**1. Aidvantage.**  O'Neil alleges that Aidvantage serviced her federal student loans, reported an erroneous student-loan balance, and failed to conduct a reasonable investigation—all in violation of the FCRA.  *See* Complaint at 6 (citing 15 U.S.C. § 1681s-2(b)).  She seems to suggest that because the Department found her *eligible* for discharge, Aidvantage was obliged as a furnisher to investigate and update her student-loan balance once it was notified of the dispute.

The FCRA imposes two relevant duties on furnishers related to credit information.  *See Scott v. First S. Nat'l Bank*, 936 F.3d 509, 517–18 (6th Cir. 2019).  First, the furnisher must provide accurate information to consumer-reporting agencies.  15 U.S.C. § 1681s–2(a).  Second, the furnisher must investigate any disputed credit information when it receives notice from a credit reporting agency about the dispute.  § 1681s–2(b).

But a private right of action against furnishers exists only for violations of the second duty.  Consumers may only sue to enforce "the requirement under § 1681s–2(b) that furnishers of information investigate upon receiving notice of a dispute, but not the requirement under § 1681s–2(a) that furnishers of information initially provide accurate information."  *Scott*, 936 F.3d at 517 (citing *Boggio*, 696 F.3d at 615).  So any cause of action O'Neil may have against Aidvantage must emerge from § 1681s–2(b).

The Complaint alleges that Aidvantage "was required to conduct an investigation" regarding the disputed information "upon receiving notice of a consumer's dispute from a consumer reporting agency."  Complaint at 6 (citing § 1681s–2(b)).  But it does not allege when—or even if—Aidvantage was notified by any of the three consumer-reporting agency defendants about disputed consumer information.  *See* Aidvantage Motion (DN 38) at 10; *see also Boggio*, 696 F.3d at 615–16 (plaintiff-borrower may "step in to enforce [her] rights only *after* a furnisher has received proper notice of a dispute from a CRA") (emphasis added); *Scott*, 936 F.3d at 517 (same).[8]

---

[8] In her response to Aidvantage's motion to dismiss, O'Neil asserts for the first time that "the CRAs forwarded these disputes" to Aidvantage.  Response (DN 40) at 3.  But this allegation appears nowhere in the Complaint, the Response presents it in an entirely conclusory manner, and O'Neil does not point to any exhibit attached to the Complaint to support this new assertion.  *See, e.g., Sistrunk v. City of Hillview*, 545 F. Supp. 3d 493, 502 (W.D. Ky. 2021) (A plaintiff "cannot rely on new assertions in a brief that have not been pled

True, the Complaint states that O'Neil sent three letters disputing her consumer information: a May 14 letter to Equifax, Experian, and TransUnion; a May 24 letter directly to Aidvantage; and a June 11 "follow-up written disput[e]" to all the Defendants. Complaint at 3. But the notices sent directly to Aidvantage were not sufficient to trigger any duty to investigate. *See Scott*, 936 F.3d at 517–18 (consumer complaint "directly to a furnisher of information about a purported error in the information the furnisher supplied to a consumer reporting agency *does not trigger* the furnisher's duty to investigate under the FCRA") (emphasis added). And the May 14 and June 11 letters that O'Neil sent to the consumer-reporting agencies likewise are insufficient, standing alone, to trigger liability. The critical question is whether the consumer-reporting agencies notified Aidvantage of the dispute—and that step is entirely missing from O'Neil's allegations.

In any event, even if the consumer-reporting agencies *had* notified Aidvantage of a dispute, O'Neil never indicates that any such notice *followed* the discharge of her debt. Which is of course the linchpin of her allegations. Aidvantage argues—and O'Neil does not appear to dispute this—that actual discharge, not eligibility for discharge, determines whether the borrower had an outstanding loan balance. *See* Aidvantage Brief at 8. Certainly no one has cited any authority to the contrary, and the Court is aware of none. When she sent her May and June "notices," therefore, O'Neil still had an undischarged loan balance. So she hasn't pointed to any inaccurate or misleading information reported by Aidvantage, which therefore couldn't have violated any duty under the statute. *See* Attached Exhibits at 8 & 9.

Recall that O'Neil disputed her outstanding loan balance in May and June— *before* she received confirmation of her debt's discharge. Her argument, although difficult to follow, seems to be that her *eligibility* for discharge required Aidvantage to remove any outstanding balance. *See* Complaint at 2–3. But the exhibits that she herself attached to her complaint contradict that assertion. She attaches and refers to a Department letter, for example, that refers to balances that still exist after the discharge-eligibility determination but before discharge. It states that her "Relevant Federal Student Loan debt will remain *in forbearance* and collections will be stopped *until* you receive relief." Attached Exhibit at 5–6 (emphasis added). This is entirely consistent with Aidvantage's reporting that she continued to carry undischarged student-loan debt, even though it was then in forbearance. That's fatal to her claim: A "threshold showing of inaccuracy or incompleteness is necessary in order to succeed on a claim under § 1681s-2(b)." *Pittman v. Experian Info. Sols., Inc.,* 901 F.3d 619, 628 (6th Cir. 2018). Because Aidvantage furnished a balance that was consistent

---

in the complaint."); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.")

with the Department's assurances (and apparently with the reality of her then-existing debt), the reported information wasn't "false" or "misleading." *Id.* at 630.

O'Neil's situation changed after discharge on June 15. And based on the exhibits attached to her complaint, Aidvantage appears to have continued to report—by now *in*correctly—that she had an outstanding balance. *See* Attached Exhibits (all dated July 3, 2025) at 31 (Equifax report with an Aidvantage balance of $219,028); *id.* at 74 (Experian report showing Aidvantage balance of $219,028); *id.* at 121 (TransUnion report showing Aidvantage balance of $219,028); *id.* at 8 (June 15 email: "congratulations on paying off your student loan"); *id.* at 9 (June 19 email: same).

But O'Neil's allegations regarding Aidvantage's post-discharge reporting still fall short. As explained above, the furnisher's duty to investigate disputed information kicks in "*after* receiving notice pursuant to section 1681i(a)(2) of this title," 15 U.S.C. 1681s-2(b) (emphasis added). Even assuming the consumer-reporting agencies notified Aidvantage of the May 14 and June 11 notices, those notices preceded the date of discharge on June 15. At that time, Aidvantage hadn't reported anything "false" or "misleading." *Pittman*, 901 F.3d at 628. And O'Neil hasn't pointed to any further communications with the reporting agencies or Aidvantage after her debts were discharged. Instead, she filed this complaint less than a week after the July 3 credit reports still showed a remaining student-loan balance.

Nothing in the Complaint, or the "exhibits" embedded therein, indicate that she filed a dispute with a consumer-reporting agency (Experian, Equifax, or TransUnion) based on the student-loan balances Aidvantage furnished in July 2025. Having failed to allege that she followed the statutory framework to initiate her dispute, she hasn't plausibly alleged a § 1681s-2(b) claim against Aidvantage.

**2. Nelnet.** O'Neil likewise argues that Nelnet violated its duties as a furnisher under § 1681s-2(b). *See* Response to Nelnet (DN 32). It's far from clear, however, which allegations in her complaint support this contention.

A complaint must include a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). And the "allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), including "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

This Complaint falls short. It mentions Nelnet *only* in the case caption. O'Neil hasn't alleged that Nelnet reported an inaccurate balance; she hasn't alleged that Nelnet serviced her student loans; and she hasn't alleged that Nelnet failed to investigate her student-loan balances. *See* Complaint at 2, 7. By contrast, she alleges

that Aidvantage "serviced" her "federal student loans," *id.* at 2, "failed to conduct a reasonable investigation into [her] dispute," *id.* at 3, and violated § 1681s-2(b), *id.* at 6.

This complete omission of Nelnet and any of its alleged misconduct from the pleadings falls well short of stating a plausible claim to relief. Other district courts, when assessing similar deficiencies, have dismissed claims for such shortcomings. *See, e.g., Kinsey v. Cnty. of Lorain*, 2018 WL 4075878, *3 (N.D. Ohio Aug. 27, 2018) ("[P]laintiff fails to include any allegations of specific conduct regarding defendants."); *Harris v. Forrester*, 2018 WL 2669989, *3 (E.D. Tenn. June 4, 2018) ("Plaintiff failed to mention [the defendant] in the body of his [c]omplaint.").

O'Neil's response to Nelnet's motion seems to suggest that attachments to her complaint supply allegations sufficient to satisfy Rule 8. *See* Response to Motion to Dismiss (DN 32) at 1–3. Nelnet at least appears in those exhibits—on letters it sent to O'Neil and on one credit report in which it furnished information. *See, e.g.*, Attached Exhibits at 3–4, 48. These hardly clarify when or how Nelnet allegedly violated the FCRA, however. The exhibits indicate that Nelnet notified O'Neil that it had "received notification from the Federal Student Aid (FSA) office that you are in the process of applying for the Borrower Defense to Repayment Program," and "[f]or this reason, a forbearance to postpone your payments has been added to your federal student loan(s)." Attached Exhibits at 3. This notification was consistent with the Department's letter (which she relies on) indicating O'Neil's eligibility for discharge. And it's consistent with the chronology as presented by O'Neil. The Department notified O'Neil that her student-loan debt "will remain *in forbearance* and collections will be stopped until you receive relief." *Id.* at 6 (emphasis added). After discharge, by contrast, the few relevant attachments show that Nelnet consistently reported a "$0.00" account balance. On June 16, 2025, Nelnet sent O'Neil confirmation of her student-loan discharge, which listed her "total balance remaining after discharge" as "$0.00." *Id.* at 4. And on July 3, 2025, an Equifax credit report indicated that Nelnet furnished a "$0.00" account balance. *Id.* at 48, 49, 50, 51, 52. These exhibits, which she supplied, contradict her conclusory assertion that "Nelnet continued to furnish information to credit reporting agencies showing substantial outstanding student loan balances." Response to Nelnet (DN 32) at 2.

## C. Leave to amend

O'Neil's responses include requests for "leave to amend" if the "Court finds any pleading deficiency." Response (DN 40) at 1; Sur-reply (DN 50) at 3. Those filings seemingly change her theory of Nelnet's and Aidvantage's liability, now relying on "duplicative tradelines and inflated total balances." *Compare* Sur-reply (DN 50) at 2 ("Both Nelnet and Aidvantage reported the same student loan balances, resulting in duplicative reporting that inflated Plaintiff's apparent indebtedness"), *with*

Complaint at 3 ("These reported balances were patently incorrect, as Plaintiff's student loans had been discharged in full.").

The Court construes these portion of O'Neil's responses as motions for leave to amend her complaint, with a request to include allegations of a purported "inflated" balance. *See, e.g., Rashad v. Westmore Carriers*, No. 3:24-cv-142, 2025 WL 2779159, *2 (W.D. Ky. Sept. 29, 2025) (construing sur-reply as request for leave to amend). Because "[t]he court should freely give leave when justice so requires," FED. R. CIV. P. 15(a)(2), granting O'Neil's request to amend is consistent with "the policy of liberality behind Rule 15(a)," *Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir. 1987).

## ORDER

The Court grants without prejudice Nelnet's (DN 30) and Aidvantage's (DN 38) motions to dismiss O'Neil's claims against them, construes O'Neil's responses as motions for leave to amend, and orders O'Neil to file any amended complaint no later than May 23, 2026.